## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| **SPACETIME3D, INC.**<br><br>     **Plaintiff,**<br><br>     **v.**<br><br>**SAMSUNG ELECTRONICS CO., LTD.,**<br>**SAMSUNG ELECTRONICS AMERICA,**<br>**INC.,**<br><br>     **Defendants.** | **Civil Action No.**<br><br>**JURY TRIAL DEMANDED** |

### COMPLAINT FOR PATENT INFRINGEMENT

1. Plaintiff SpaceTime3D, Inc., complains against Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc., as follows:

### THE PARTIES

2. Plaintiff SpaceTime3D, Inc., is an application software company incorporated in New York, NY. Founded by Ezra Eddie Bakhash ("Mr. Bakhash"), SpaceTime3D delivers a seamless digital experience for consumers by using imaging and three-dimensional graphical technology to remove and expand the visual and spatial constraints on small screen displays.

3. On information and belief, Defendant Samsung Electronics Co., Ltd. ("Samsung Electronics") is a company organized and existing under the laws of the Republic of Korea, with its principal place of business at 129 Samsung-ro, Yeongtong-gu, Suwon-si, Gyeonggi-Do, Korea 443-742.

4. On information and belief, Defendant Samsung Electronics America, Inc. ("Samsung USA") (collectively with Samsung Electronics, "Defendants" or "Samsung") is a

1

corporation organized and existing under the laws of New York, with its principal place of business at 85 Challenger Road, Ridgefield Park, New Jersey 07660.  Samsung USA may be served through its registered agent for service of process, CT Corporation System, 1999 Bryant Street, Suite 900, Dallas, Texas 75201.

5. Plaintiff is informed and believes, and on that basis alleges, that Samsung Electronics America is a wholly owned subsidiary of Samsung Electronics, and oversees domestic sales and distribution of Samsung's consumer electronics products, including the products accused of infringement in this case.

6. Plaintiff is informed and believes, and on that basis alleges, that Samsung Electronics America recently merged with Samsung Telecommunications America, Inc. ("STA"), based in Richardson, Texas, which operated Samsung's North American business with respect to mobile phones and telephony equipment.

### JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

8. This Court has personal jurisdiction over Samsung Electronics and Samsung USA because, *inter alia*, they have done and continue to do business in Texas, and have committed and continue to commit acts of patent infringement in Texas, including making, using, offering to sell and/or selling accused products in Texas, and/or importing accused products into Texas, and/or inducing others to commit acts of patent infringement in Texas.  For example, Plaintiff is informed, and on that basis alleges, that Samsung Electronics and Samsung USA maintain established places of business in Texas and the Eastern District of Texas specifically, including an office at 1000 Klein Road, Plano, Texas 75074, and at 1301 East Lookout Drive, Richardson, Texas 75082.

Samsung Electronics and Samsung USA have not disputed this Court's personal jurisdiction over them in other recent patent-infringement actions. *See, e.g.*, Answer at ¶ 10, *Barkan Wireless v. Samsung Elecs. Co., Ltd. et al.*, No. 2:18-cv-00028-JRG, Dkt. 25 (E.D. Tex., Apr. 23, 2018); Answer at ¶ 9, *Immersion Corp. v. Samsung Electronics America*, No. 16-cv-572 (E.D. Tex. Oct. Oct 24, 2017); Answer at ¶ 10, *Richardson v. Samsung Electronics Co.*, No. 6-17-cv-428 (E.D. Tex. Oct. 20, 2017).

9. Venue is proper against Samsung Electronics pursuant to 28 U.S.C. § 1391(c)(3) because venue is proper in any judicial district against a foreign corporation. *See In re HTC Corp.*, 889 F.3d 1349, 1354 (Fed. Cir. 2018).

10. Venue is proper against Samsung USA in this District pursuant to 28 U.S.C. § 1400(b) because it has maintained established and regular places of business in this District and has committed acts of patent infringement in the District. *See In re Cray Inc.*, 871 F.3d 1355, 1362-63 (Fed. Cir. 2017).

11. In other recent patent actions, Samsung Electronics and Samsung USA either "admit[ted]," Answer at ¶ 14, *Richardson v. Samsung Electronics Co.*, No. 6-17-cv-428, Dkt. No. 1 (E.D. Tex. Oct. 20, 2017), or "d[id] not contest,"  Answer at ¶ 10, *Immersion Corp. v. Samsung Electronics America*, No. 16-cv-572 (E.D. Tex. Oct. 24, 2017), that this District is a proper venue for patent infringement actions against them. *See also, e.g.*, Samsung Defendants' Answer at ¶ 12, *Barkan Wireless*, No. 2:18-cv-00028-JRG, Dkt. 25 (E.D. Tex., Apr. 23, 2018).

## PATENTS-IN-SUIT

12. SpaceTime3D is the assignee of United States Patent No. 8,881,048 (the "'048 patent"), entitled "System and Method for Providing Three-Dimensional Graphical User Interface," a true and correct copy of which is attached as **Exhibit A**. The '048 patent is designated

a continuation of the application resulting in an earlier 7,735,018 patent (the "'018 patent"); bears a domestic filing date of March 31, 2010; and was duly and legally issued by the PTO on November 4, 2014.  Mr. Bakhash is the sole inventor of the '048 patent.

13. SpaceTime3D is also the assignee of United States Patent No. 9,304,654 (the "'654 patent"), entitled "System and Method for Displaying a Timeline Associated with a Plurality of Applications," a true and correct copy of which is attached as **Exhibit B**.  The '654 patent is designated a continuation of the applications resulting in the '018 and '048 patents; bears a domestic filing date of September 30, 2014; and was duly and legally issued by the PTO on April 5, 2016.  Mr. Bakhash is the sole inventor of the '654 patent.

14. SpaceTime3D is additionally the assignee of United States Patent No. 9,696,868 (the "'868 patent"), entitled "System and Method for Providing Three-Dimensional Graphical User Interface," a true and correct copy of which is attached as **Exhibit C**.  The '868 patent is designated a continuation of the applications resulting in the '018, '048, and '654 patents; bears a domestic filing date of February 5, 2015; and was duly and legally issued by the PTO on July 4, 2017.  Mr. Bakhash is the sole inventor of the '868 patent.

15. Collectively, the '048, '654, and '868 patents are referred to as the "patents-in-suit."

16. The patents-in-suit, generally speaking, provide specific, non-conventional improvements to then-existing computer graphical user interfaces ("GUIs"), by providing an interactive computing interface and sorting interface comprising information from real-time and static sources, including but not limited to meta search results from the Web, information from application program interfaces, web services, search engines, application programs, networks, and files on the end user's desktop.  The claims of the patents-in-suit are directed to specific systems and methods for easily, efficiently, and intuitively interacting with and switching between

4

applications operating on a computing device by switching between individual, active applications in a two-dimensional space and images of applications in a three-dimensional space. The claims of the patents-in-suit are particularly advantageous in ultra-mobile personal computer ("UMPC") devices having limited screen sizes, reduced processing power, and limited electrical (e.g., battery) power, by allowing a user to interact with a first, active application in a two-dimensional space (e.g., to acquire and/or modify the application-specific data presented to the user) and switching to a second, active application by (i) replacing the first application in two-dimensional space with images of a plurality of application in a three-dimensional space, (ii) allowing the user to select an image of the second application, and (iii) replacing the plurality of images in three-dimensional space with the second, active application in a two-dimensional space. By presenting the images in a "three-dimensional space," where each image was captured at a "time" when the corresponding, active application was last interacted with (hence "SpaceTime3D"), a user can easily, efficiently, and intuitively scroll through the plurality of images (e.g., arranged in chronological order) and select an image of interest. By switching between individual, active applications in a two-dimensional space and images of a plurality of applications in a three-dimensional space, which is a non-conventional technique that exploits the fact that images of applications can be more easily manipulated in a three-dimensional space than the active applications themselves, the claimed invention improves the functionality of the computing (e.g., UMPC) devices by requiring less power, minimal (or reduced) processing, and smaller screen sizes.

17. The patents-in-suit specifically identify problems with the conventional system of inputting information into a computer to achieve a given output, which involves a series of tedious steps—repetitive mouse clicks and keyboard inputs—to run applications and documents or

navigate to certain information. '868 Patent, col. 1:41-45.  To switch to a different application or document on a computer, the user often has to close her current applications and documents, hide them or overlap them on a finite desktop by drawing them on top of each other, and then mine through folder within folder to find them again at a later date. Because the user's desktop is finite, she must redo these same tasks over and over again.  *Id.* at col. 1:45-51.

18. This conventional system wastes the end user's time by (1) requiring many mouse clicks to open and close applications and/or documents, (2) requiring the user to remember the combinations of programs and documents she may need for a given purpose, and (3) requiring the user to create elaborate hierarchical folder systems to aid in the process of storing and recalling applications and/or documents. *Id.* at col. 1:52-56.

19. Further, the conventional operating system presents computer output, including applications and documents, in a two-dimensional visual display.  *Id.* at col. 1:59-62.  This output is usually confined within a window that is drawn on a finite-sized desktop—that is, the working area of a computer—with a fixed length and width.  When the computer's output exceeds the finite working graphical area, elements of the GUI (i.e. the windows) are typically drawn on top of each other such that the GUI components overlap on top of one another.  *Id.* at col. 2:7-13.

20. The invention claimed in the patents-in-suit solves these known technological shortcomings in computers in a particular, non-conventional way: by providing an improved GUI that switches between individual, active applications in a two-dimensional space and images of a plurality of applications in a three-dimensional space.  *Id.* at col. 2:53-56.  More specifically, the patents-in-suit recite a specific improvement over prior-art systems and methods by solving problems present in computers, especially UMPCs, having relatively small displays, limited processing capabilities, and limited amounts of power.  While such devices can run individual

applications, they are not designed to run and update a display for multiple applications simultaneously because (1) the display is too small, and (2) there is insufficient processing power to operate and *update the display for* many applications simultaneously, let alone to manipulate and *update the display for* many active applications in three-dimensional space.

21. To solve these computer-based problems, the claimed invention teaches the system and method of opening applications in two-dimensional ("2D") space, switching from applications in 2D space to *images* of those applications in three-dimensional ("3D") space, manipulating the images in 3D space, and switching back and forth from the images in 3D space to the applications in 2D space.[1]

22. In order to increase space on a user's desktop, eliminate the need to constantly open and close programs or hide and reveal them each time the user needs them, and reduce the number of mouse clicks ('868 Patent, col. 37: 28-35)—improvements that are particularly useful on small-screen devices including UMPCs (*id.* at col. 38:19-26), the claimed invention allows users to switch from the traditional 2D view to a 3D view, where a plurality of images is displayed.  These improved interfaces allow the end user to "toggle or switch between 2D and 3D for any selectively captured computing output and information (webpages, applications, documents, desktops or anything that can be visualized on a computer)." *Id.* at col. 22:25-30.

23. The claimed invention further discloses how, once in the 3D space, images of open applications are captured and manipulated as the user interacts with them.  To this end, the specification provides that "[t]he memory module preferably comprises executable code for the processor to capture the computing output from at least one computer source in response to the

---

[1] The description of the claimed invention in this and proceeding paragraphs refers to applications, but is not limited to any particular application and includes other objects, including but not limited to web browsers and documents.

received end user input and present the computing output as at least two objects within a three-dimensional virtual space displayed on the display screen," *id.* at col. 3:31-37; that "the subject matter of a simulated 3-D Cartesian space drawn within the two-dimensional display or Window of an end user's computer is preferably redrawn in a cyclical fashion . . . to refresh the scene such that changes to the objects drawn must happen quickly enough based on the responses of the end user such that the experience feels truly interactive," *id.* at col. 14:41-47; and that "[t]he program recalculates the shapes and sizes of objects or geometry in the scene/3D Cartesian space to reflect the location or visual perspective of the end user in the local coordinate system . . . [and] the program will redraw the scene in a cyclical fashion" "to achieve a realistic real-time experience," *id.* at col: 16-41-47; *see also id.* at Fig. 2 (showing how "user input" "recalculate[s] geometry in scene based on new viewpoint or perspective" and "redraw[s]" scene); Fig. 3 (describing the method of periodically capturing on screen the output of window for a program/information as a bitmap image; storing bitmap image in a frame buffer; mapping visual output of OS control, bitmap, or API on to arbitrary 3D geometry; and creating device input event handler in 3D); col. 3:42 (describing claimed invention's "chronological order" feature); col. 19:15-26 (describing claimed invention's ability to manipulate images based on the user's deletion of an image in 3D space).

24. The claimed invention further discloses how the user can select an image from the plurality of images displayed in 3D space, where the selected image is then reopened in 2D space, for instance, by "clicking button 398 [of Fig. 10], [which] binds the end user to a close-up viewpoint of the first page in the 3D stack," versus "clicking button 406 [of Fig. 10], [which] binds the user to a close-up viewpoint of the last page in the stack," *id.* at col. 18:56-59; and by describing

8

the "bind to HUD" technique, where an application that was selected in 3D space is brought into 2D space, *id.* col. 21:58-67, 22:1-22.

25. In sum, the patents-in-suit disclose improved user interfaces for electronic devices, particularly for those with small screens like UMPCs, by solving the computer-based problem of displaying only small active windows in two-dimensional spaces, which in turn limits the amount of content displayed. The patents-in-suit solve this problem by disclosing specific systems and methods that allow screens to display images in an immersive three-dimensional space, enabling users to see and navigate through unlimited amounts of content. The patents-in-suit thus deliver an improved user interface in a computer-related invention.



*Fig. 1.*    Illustrations of pre-SpaceTime3D two-dimensional screen display (left) versus SpaceTime3D's three-dimensional screen display (right).

### THE PARTIES' PAST RELATIONSHIP
### AND DEFENDANTS' USE OF SPACETIME3D'S TECHNOLOGY

26. Defendants Samsung Electronics and Samsung USA are interrelated entities that, together, comprise one of the world's leading manufacturers of UMPC products.

27. Defendants make, use, offer to sell, sell, and/or import into the United States products and/or systems that infringe the patents-in-suit.

28. As described below, Defendants' infringement of the patents-in-suit was and continues to be willful and deliberate.

9

29. On March 29, 2007, SpaceTime3D published a patent application that matured into the '018 patent, the parent patent of the patents-in-suit.  Soon thereafter, SpaceTime3D released a public beta version of a browser using its published, patent-pending technology on June 4, 2007. Shortly following its debut, SpaceTime3D's technology received favorable press coverage in numerous publications including but not limited to the *San Jose Mercury News*, *The Washington Post*, *The Wall Street Journal*, *The Economist*, *Popular Science*, *PC World*, *Tech Digest*, *TechNewsWorld*, *Renderosity*, and InternetNews.com.

30. For instance, on June 4, 2007, reporter Dean Takahashi of the *San Jose Mercury News* exclaimed that SpaceTime3D's product "is the most advanced 3-D navigation system I've seen."[2]

31. On June 8, 2007, reporter Jack Germain of TechNewsWorld wrote that SpaceTime3D's "innovative three-dimensional search program," "deliver[ed] on its promise to save me time and provide a revolutionary online searching tool,"—"even in its pre-beta release form."[3]

32. Mr. Germain further elaborated on the superiority of SpaceTime3D's beta browser over other widely used web browsers already on the market:

> As cool as it is to search for products and text in 3-D, I was particularly impressed with SpaceTime's tab browsing capabilities.  It is much more than what is available with the tabbed browsing feature in Microsoft's Internet Explorer 7.0 or in the open source Firefox browser.

---

[2] Dean Takahashi, "Takahashi: Software allowing users to search web in 3-D still in infancy," *The Mercury News* (June 4, 2007 4:23 A.M.), https://www.mercurynews.com/2007/06/04/takahashi-software-allowing-users-to-search-web-in-3-d-still-in-infancy/.

[3] Jack Germain, "SpaceTime Browser Adds New Dimension to Search," TechNewsWorld (June 8, 2007 5:00 A.M.), https://www.technewsworld.com/story/57733.html.

> With SpaceTime, I have an unlimited 3-D space.  This lets me map out my browsing progress in a visual time line, treating each Web site as an object that I can manipulate and rearrange within the 3-D environment.
>
> SpaceTime also lets me alternate between 3-D and 2-D perspectives by double clicking on a 3-D display and then clicking the Return button.  This process eliminates the hassle of reading and closing pop-up windows and clicking on the Back button.  As much as I like the ability in Firefox to open a new tab when I click on a search link, viewing a stack of 10 related search objects in one flexible view leaves all the other two-dimensional browsers in the digital dust.

33. On February 2, 2008, nearly a year after the publication of the '018 patent application and following months of press coverage, a Samsung USA employee in charge of purchasing new technologies emailed SpaceTime3D: "It seems like your 3d browser can be at its best when it is used in UMPC.  Samsung has a number of UMPC products, and I would like to find out if SpaceTime is planning to introduce a browser targeted penetrate [sic] in UMPC."

34. SpaceTime3D responded with an offer to license the patent-pending technology. On or around March 6, 2008, SpaceTime3D met with the Samsung USA employee to present SpaceTime3D's technology.

35. On March 11, 2008, as a follow-up to the meeting, SpaceTime3D shared confidential data with Defendants.

36. From the very beginning of the parties' interactions, SpaceTime3D made clear that its technology was being patented.  In a March 11, 2008 email distinguishing SpaceTime3D's technology from a Windows Vista explorer, SpaceTime3D wrote to the Samsung USA employee:

> SpaceTime is 3D INTERACTIVE.  When you FLY through the 3D scene and change your viewpoint, whatever information you are looking at (web page, video, application window, document), SpaceTime allows you full 3D INTERACTIVITY of the web page, video, application window or document while you are in 3D. . . . ***This 3D INTERACTIVITY is part of the SpaceTime Patent.***

37. With knowledge of the fact that SpaceTime3D's technology was patent-pending, Defendants continued to solicit confidential information from SpaceTime3D.  For instance, on

11

May 6, 2008, another Samsung USA employee invited SpaceTime3D to attend its "2nd Samsung Sourcing Conference and Event" in order to "discuss future collaboration with Samsung Digital Media Groups.  This event will provide an opportunity for us to get an understanding of Spacetime technology and solutions to discuss its applicability to our Digital Media Products.  Samsung is looking forward to discussing potential collaboration to implement Spacetime's technology to our Digital Media Groups."

38. On or around May 19-21, 2008, SpaceTime3D attended the Samsung Sourcing Conference and Event, which took place in San Jose, California.

39. A few days before this Conference, SpaceTime3D sent a Samsung USA employee a PowerPoint presentation to facilitate the parties' discussion of a potential licensing agreement. That presentation also made clear that SpaceTime3D's technology was patent-pending.



*Fig. 2.*  Slide 2 in May 15, 2008 PowerPoint presentation from SpaceTime3D to Samsung USA.



*Fig. 3.*  Slide 12 in May 15, 2008 PowerPoint presentation from SpaceTime3D to Samsung USA.

40. Following the May 2008 Conference, Samsung USA notified SpaceTime3D that Samsung Electronics, in Korea, would also review SpaceTime3D's technology.  On June 4, 2008, Samsung USA asked Mr. Bakhash when he "would be able to travel to Korea to meet with my UI engineers in Suwon for further technical discussions and demos."  Mr. Bakhash did not make the trip to South Korea.

41. But on or around August 15, 2008, Samsung USA and SpaceTime3D had yet another meeting in San Jose, California.

42. Throughout the months of communications between SpaceTime3D and Defendants in 2008, Defendants continually solicited confidential data from SpaceTime3D, and SpaceTime3D disclosed such data to Defendants.

43. In 2010, the parties resumed their negotiations about SpaceTime3D's technology, this time specifically for multitouch tablets and netbooks.  On April 16, 2010, for instance, a

13

Samsung USA employee noted his "excit[ement] to hear that [SpaceTime3D] just released a very powerful new GUI for tablets and netbooks," inquired about the "basic platform," expressed that he would "love to see the new development of [SpaceTime3D's] technology, and asked that SpaceTime3D "[p]lease send me the changes and improvements you've make [sic] until now. Samsung's new tablet runs Android so I'm wondering if your browser is compatible."

44. Again, on April 20, 2010, Samsung USA offered to "start talking about technical collaboration and potential co-development agreement," first "by getting our engineers interested by showing them what SpaceTime is offering and how it makes the user experience better."

45. In May 2010, the parties participated in a call to continue discussing SpaceTime3D's technology.  The following month, SpaceTime3D submitted a demonstration of SpaceTime3D's technology for tablets to Defendants' User Interface team.

46. As during the parties' discussions in 2008, SpaceTime3D made clear to Samsung USA in 2010 that its technology was patent-pending.  In a May 26, 2010 email from SpaceTime3D to a Samsung USA employee, for example, SpaceTime3D wrote:

> ***The SpaceTime patent*** allows our visual operating system (GUI) to present a visual stack featuring the controls (windows, web pages, widgets, applications, flash, etc. . . .) in an immersive 3D environment where all of these controls will actually work in 3D without the end user having to leave the 3D GUI or go to the desktop to operate these controls.  You can imagine how useful this can be if you are creating a GUI for Android (or other OS) and you would like a seamless easy way to represent the operating system's control in your own custom GUI.

47. Further, on or around June 3, 2010, SpaceTime3D sent Samsung USA a video demonstration of SpaceTime Tablet.  In the description accompanying this video demonstration, SpaceTime3D wrote:

> From this video, I think you can see how powerful our User Interface can be as it leverages six main features to power a Multi-Touch tablet: (1) the visual stack metaphor to choose Apps . . .  and consume content , (2) the timeline with icons to organize one's history and keep track of multitasking, . . . and most importantly (6) our ***patented interactivity*** of web pages, flash, video, applications or any operating system controls

in an immersible 3D environment where one can interact and use what you are looking at right where you are computing without leaving the 3D User Interface.

48. In or around August 2010, Defendants abruptly stopped communicating with SpaceTime3D.

49. In addition to SpaceTime3D's communications with Samsung, Samsung also had actual knowledge of SpaceTime3D's patents from prosecuting its own patents.  For example, U.S. Patent Application 12/621,067 and U.S. Patent Application 12/755,564, both assigned to Samsung Electronics, cite to SpaceTime3D's Patent Application 11/531,676, which matured to become the parent patent to the patents-in-suit.  U.S. Patent Application 13/049,262, also assigned to Samsung Electronics, cites to SpaceTime3D's Patent 12/751,879, which matured to become the '048 patent.

50. The patent prosecution history of Samsung's Patent Application 12/621,067 ("Method for Providing Graphical User Interface and Electronic Device Using the Same"), in particular, has extensive references to the '018 patent, i.e. the parent patent to the patents-in-suit. In June 2012, the examiner initially issued a non-final rejection, deeming the Samsung claims to be unpatentable under 35 U.S.C. § 103(a) in part "in view of Bakhash (US Patent No. 7,735,018)." "It would have been obvious to one of an ordinary skill in the art, having the teachings of Park and Bakhash at the time the invention was made to modify an enlargement command for a GUI item of Park to include a 2D or 3D visual display, as taught by Bakhash," the examiner explained.

51. Samsung Electronics then filed a response discussing SpaceTime3D's patent and expressly distinguishing its own claims.

52. Notwithstanding their actual notice and/or actual knowledge of SpaceTime3D's patents, Defendants have infringed and continue to infringe the patents-in-suit.

15

## DEFENDANTS' ACCUSED PRODUCTS

53. Defendants' infringing products (the "Accused Products") include all of Samsung's Galaxy "S," "Note," and "Tab" products, including variations thereof (e.g., "+" and "edge"), that were sold, offered for sale, made, used or imported from at least 2014 to the present.

54. The graphical user interface of Defendants' first-generation Galaxy smartphone—announced on or around April 27, 2009—incorporated SpaceTime3D's now-patented technology. Defendants exploited this technology without a license to use SpaceTime3D's patents-in-suit and continue to do so in later generations of its Accused Products to the present day.

55. In fact, Defendants' Galaxy smartphone includes a dedicated button—on the bottom left of the device—through which the user can access a three-dimensional application navigator.  That button looks very much like the SpaceTime3D logo, which was included in all material that SpaceTime3D shared with Defendants in their many months of communication.

 

*Fig. 4.*  SpaceTime3D's logo (left) and the Samsung Galaxy smartphone's button through which users can access a three-dimensional application navigator.

56. The graphical user interface of Defendants' Samsung Galaxy Tab—a line of Android-based tablet computers that Samsung first announced on or around September 2, 2010—incorporated SpaceTime3D's now-patented technology.  Defendants exploited this technology

without a license to use SpaceTime3D's patents-in-suit and continue to do so in later generations of its Accused Products to the present day.

57. The Accused Products, including but not limited to the Galaxy smartphones and Galaxy Tab tablet computers, include a graphical user interface that receives inputs from end users, captures computing output from at least one computer source in response to the received end-user input, and presents the computing output as at least two objects within a three-dimensional virtual space displayed to the end user.

58. As one example, the Accused Products are preloaded with at least the standard Android Chrome browser, as well as the Samsung Internet browser. The Android Chrome and Samsung Internet browsers both receive at least a first and second input from an end user through button(s) on the home screen and/or a capacitive touchscreen. For example, the end user can enter at least a first and second website address using the touchscreen, after which the Accused Products display at least two stacked tabs—each corresponding with an image of the entered website address—in three-dimensional space.

59. Both browsers receive additional interactions from the end user when the user clicks on one of the tabs displayed in the three-dimensional space. That interaction switches the displayed screen from the three-dimensional space to a two-dimensional space of the selected website.



*Fig. 5.* Illustrations of a three-dimensional space displaying overlapping images of two websites (left) and a two-dimensional space displaying one active website (right) in the preloaded Chrome browser.



*Fig. 6.* Illustrations of a three-dimensional space displaying overlapping images of three websites (left) and a two-dimensional space displaying one active website (right) in the preloaded Samsung Internet browser.

18

60. The Accused Products infringe SpaceTime3D's patented technology also by displaying images of open applications in a three-dimensional space.  End users can navigate and/or cycle through images of open applications and interact with one particular application by selecting the corresponding image on the touchscreen.  That interaction replaces the images of all open applications in the three-dimensional space with the selected application in a two-dimensional space.

 

*Fig. 7.*  Illustrations of a single active application (i.e. Clock) displayed in two-dimensional space (left) and images of three open applications (i.e. Chrome, Calendar, and Clock) in three-dimensional space (right) on a Samsung Galaxy smartphone screen.

61. In fact, Defendants provide instructions on how users can use the three-dimensional viewer for open applications at Samsung USA's official YouTube channel.  For instance, for the Galaxy S7, Defendants' video instructs users to click on the "Recents" button, i.e. the button that looks remarkably similar to SpaceTime3D's logo, to "pull[] up your open apps and windows."

19



*Fig. 8.* Screenshot of Defendants' instructional video on using the Galaxy S7's "Recents" button.



*Fig. 9.* Screenshot of Defendants' instructional video explaining how open apps are displayed in a three-dimensional stack after the user clicks on the Galaxy S7's "Recents" button.

62. Likewise, the Galaxy S8 allows users to pull up all open applications that display in a three-dimensional stack.  Defendants tout this feature in instructional videos, also through Samsung USA's official YouTube channel.



*Fig. 10.*  Screenshot of Defendants' video on the Galaxy S8, which includes the capability to pull up all open applications displayed in a three-dimensional stack.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 8,881,048

63. SpaceTime3D repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

64. Defendants have infringed and continue to infringe the '048 patent directly and/or indirectly (by inducing infringement by others) by, *inter alia*, making, using, selling, importing, and/or offering for sale systems and/or methods that use a two-dimensional space to display and

interact with a particular application and a three-dimensional space to visualize, manipulate, navigate, and select among images of open applications, in the manner recited in the claims of the '048 patent.

65. In the alternative to literal infringement, Defendants have infringed and continue to infringe the '048 patent under the doctrine of equivalents.

66. For example, claim 8 is illustrative of the claims of the '048 patent.  It recites "[a] system for providing a three-dimensional (3D) graphical user interface, comprising: a display screen; an input device for receiving at least one input from an end user; a processor module operatively coupled to the display screen and the user input device; and a memory module operatively coupled to the processor module, the memory module comprising executable code for the processor module to; receive at least first and second inputs from an end user; receive first and second webpages from at least one source in response to said first and second inputs, wherein the first and second inputs are website address corresponding to said first and second webpages, respectively; display at least a portion of the first webpage on a first object within a 3D space on the display screen, and at least a portion of the second webpage on a second object within the 3D space on the display screen, comprising; rendering the first and second webpages; capturing first and second images of [] at least a portion of the first webpage and [] at least a portion of the second webpage, respectively; and texturing the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second object being displayed in a background of the 3D space; and display additional information, comprising: receiving an interaction by the end user on the first image; replacing the first and second objects within the 3D space with a window within a two-dimensional (2D) space on the display screen in response to receiving the interaction, wherein the window includes the rendered

22

first webpage; receiving an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to the additional information; rendering the additional information; and displaying the rendered additional information on the display screen in said window within the 2D space on the display screen."

67. Defendants' Accused Products, including but not limited to the Samsung Galaxy S7 ("S7"), practice every element of these claims.[4]

68. Accused Products are a system for providing a three-dimensional (3D) graphical user interface.

69. Accused Products comprise a display screen, as seen in the image below.



*Fig. 11*. Illustration of Accused Products' display screen, available at https://www.samsung.com/global/galaxy/galaxy-s7/design/.

70. Accused Products' touchscreen allows multiple, simultaneous inputs to be entered by a user.   The Accused Products also include context-sensitive "soft" buttons, such as a back button and a "Recents" button, the latter of which pulls up a user's open applications and windows.

71. Accused Products comprise a processor module operatively coupled to the display screen and the user input device.  For example, the S7 of the Accused Products includes a CPU

---

[4] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Defendants' products infringe.

and GPU, as indicated by Samsung's website.  The processor is a Qualcomm Snapdragon 820

processor, which is operatively coupled to the display screen and the user input device.



*Fig. 12.* Screenshot of Defendants' website touting Accused Products' CPU and GPU, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

72. Accused Products comprise a memory module operatively coupled to the processor

module, the memory module comprising executable code for the processor module.  Accused

Products include RAM memory modules and flash memory modules and are also compatible with

microSD and SIM cards.



*Fig. 13.* Screenshot of Defendants' website touting Accused Products' increased RAM memory modules, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

73. The memory module comprises executable code for the processor module to execute. For example, Accused Products are preloaded with at least the Google Chrome browser application and the Samsung Internet browser application. In the below images, both applications can be seen loaded on an Accused Product. These applications are located in the memory module of the Accused Products.

 

*Fig. 14.* Illustrations of the preloaded Google Chrome application (left) and the preloaded Samsung Internet application (right) in the Samsung Galaxy S7.

74. Accused Products receive at least a first and second input from an end user by way of buttons on the home screen and/or a capacitive touchscreen. Accused Products' touchscreens allow multiple, simultaneous inputs to be entered by a user.

75. Accused Products receive a first and second webpage from at least one server in response to the first and second inputs. The first and second inputs are website addresses corresponding to the first and second webpages. As stated above, the Chrome and Samsung Internet browsers each provides a user interface capable of receiving first and second webpages

25

from at least one server in response to user inputs requesting that said webpages are transmitted. The following description of infringement uses the Samsung Internet browser as its non-exhaustive example.

76. In the left image below, a user has entered "Netflix.com" into the Samsung Internet browser. Accused Products received the Netflix.com webpage in response to the input. In the right image below, the user has entered "susmangodfrey.com" into the Samsung Internet browser. Accused Products received the susmangodfrey.com webpage in response to the input.

 

*Fig. 15.* Illustrations of a two-dimensional space displaying the Netflix.com webpage (left) and the susmangodfrey.com webpage (right) in the Samsung Internet browser.

77. Accused Products display at least a portion of a first webpage on a first object within a three-dimensional space and at least a portion of the second webpage on a second object within the three-dimensional space. For example, in the image below, multiple tabs in the Samsung Internet browser can be seen on the screen. The screen displays a three-dimensional space, in which the tabs are stacked from deeper into the screen to more shallow on the screen. The second webpage (susmangodfrey.com) can be seen on the foremost tab; behind that tab, a portion of the first webpage (Netflix.com) can be seen.

26



*Fig. 16.* Illustration of a three-dimensional space displaying a portion of a first webpage (Netflix.com) and a second webpage (susmangodfrey.com) in the Samsung Internet browser.

78. The Samsung Internet browser on Accused Products renders the first and second webpages.

79. Accused Products capture first and second images of at least a portion of the first webpage and at least a portion of the second webpage, respectively.  In Figure 16 above, Accused Products generated a first image of a portion of a first webpage (Netflix.com) in its Samsung Internet browser.

80. Accused Products texture the first image on the first object and the second image on the second object, the first object being displayed in a foreground of the 3D space and the second image being displayed in a background of the 3D space.  In Figure 16 above, the susmangodfrey.com webpage can be seen on the foremost tab; behind that tab, a portion of the Netflix.com webpage can be seen.

81. Accused Products display additional information, including at least links to additional webpages.  Accused Products receive an interaction by the end user on the first image.

For example, when the user clicks on one of the tabs corresponding with an image of a webpage for an entered URL, the clicked tab is displayed to a user and becomes the active browser tab.

82. Accused Products replace the first and second images within the three-dimensional space with a window within a two-dimensional space in response to receiving the interaction, wherein the window includes the selected webpage.  In the first image below, for instance, the user can see the three-dimensional tab view.  If the user selects one of the tabs, the user is brought to a two-dimensional space in response, wherein the window includes the rendered webpage associated with the selected tab.



*Fig. 17*. Illustrations of a three-dimensional space displaying images of two webpages (left) and a two-dimensional space displaying the user-selected webpage (susmangodfrey.com) (right) in the Samsung Internet browser.

83. Accused Products can also receive an interaction by the end user on a link provided in the rendered first webpage, the link corresponding to additional information.  In the image below, the underlined text "Learn More" is an HTML link corresponding to additional information.



*Fig. 18.* Illustration of a webpage (Samsung.com), with at least one link corresponding to additional information, in the Samsung Internet browser.

84. Accused Products render the "additional information," that is, rendering the linked-to page interacted with by the user.  Accused Products display the rendered additional information on the display screen in said window within the two-dimensional space on the display screen.  For example, in the image below, a user has tapped the "Learn More" link in Figure 18.  The Samsung Internet browser, in response, renders the webpage at the linked address and displays it to the user.



*Fig. 19.* Illustration of additional information rendered in the Samsung Internet browser after a user has tapped the "Learn More" link as displayed in Figure 18 above.

85. Defendants' infringement of at least Claim 8 of the '048 patent is ongoing.

86. Where acts constituting direct infringement of the '048 patent are not performed by Defendants, such acts are performed by Defendants' customers and/or end users, who act at the direction and/or control of Defendants, with Defendants' knowledge.  Defendants took active steps, directly and/or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes claims of '048 patent.  Such steps by Defendants include but is not limited to advising and directing customers and/or end users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; and/or distributing instructions that guide end users to use the Accused Products in an infringing manner.  Defendants perform these steps, which constitute induced infringement, with knowledge of the patents-in-suit and with the knowledge that the induced acts constitute infringement.  Defendants are aware that the normal and customary use of

the Accused Products by their customers and/or end users would infringe the patents-in-suit. Defendants' induced infringement is ongoing.

87. Defendants' acts of infringement have caused damage to SpaceTime3D, and SpaceTime3D is entitled to recover from Defendants the damages it sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 9,304,654

88. SpaceTime3D repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

89. Defendants have infringed and continue to infringe the '654 patent directly and/or indirectly (by inducing infringement by others) by, *inter alia*, making, using, selling, importing, and/or offering for sale systems and/or methods that use a two-dimensional space to display and interact with a particular application and a three-dimensional space to visualize, manipulate, navigate, and select among images of open applications, in the manner recited in the claims of the '654 patent.

90. In the alternative to literal infringement, Defendants have infringed and continue to infringe the '654 patent under the doctrine of equivalents.

91. For example, claim 10 is illustrative of the claims of the '654 patent.  It recites "[a] system for displaying a timeline associated with a plurality of applications and allowing a user to modify an output of one of said plurality of applications by interacting with said information, comprising: a display device; at least one input device; at least one processor operatively coupled to said display device and said at least one input device; and a memory device comprising executable code for: receiving a plurality of inputs from said at least one input device, said plurality

31

of inputs comprising at least first, second, and third inputs; opening said plurality of applications in response to said plurality of inputs, said plurality of applications comprising at least first, second, and third applications, wherein each one of said plurality of applications is configured to (i) generate an output having application-specific data, (ii) display said output on a display device, and (iii) allow said user to modify at least a portion of said application-specific data by interacting with said output; and displaying on said display device said timeline associated with said plurality of applications, comprising; generating a plurality of images, said plurality of images comprising at least first, second, and third images, wherein said first image is an image of at least a portion of an output generated by said first application and having first application-specific data, said second image is an image of at least a portion of an output generated by said second application and having second application-specific data, and said third image is an image of at least a portion of an output generated by said third application and having third application-specific data; and displaying said plurality of images within a three-dimensional space on said display device in an order based on a last time that said at least one processor received (i) said first input and a last interaction with said first object, (ii) said second input and a last interaction with said second object, and (iii) said third input and a last interaction with said third object, such that a first one in said order is displayed in a foreground of said three-dimensional space, and second and third ones in said order are displayed in a background of said three-dimensional space; and allowing said user to modify at least a portion of one of one of said first, second, and third application-specific data, comprising: receiving a fourth input from said at least one input device, said fourth input interacting with one of said plurality of images corresponding to one of said plurality of applications; replacing said plurality of images within said three-dimensional space with one of said first, second, and third objects corresponding to said one of said plurality of applications within a two-dimensional space in

32

response to said fourth input; receiving a fifth input from said at least one input device, said fifth input interacting with said one of said first, second, and third objects within said two-dimensional space; and modifying said one of said first, second, and third application-specific data in response to said fifth input."

92. Defendants' Accused Products, including but not limited to the Samsung Galaxy S7 ("S7"), practice every element of these claims.[5]

93. Accused Products provide a system for displaying a timeline associated with a plurality of applications and allowing a user to modify an output of one of said plurality of applications by interacting with said timeline as described below.

94. Accused Products comprise a display screen, as seen in the image below.



*Fig. 20.* Illustration of Accused Products' display screen, available at https://www.samsung.com/global/galaxy/galaxy-s7/design/.

95. Accused Products comprise at least one input device. Accused Products' touchscreens allow multiple, simultaneous inputs to be entered by a user. Accused Products also include context-sensitive "soft" buttons, such as a back button and a "Recents" button, the latter of which pulls up a user's open applications and windows.

---

[5] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Defendants' products infringe.

96. Accused Products comprise a processor module operatively coupled to the display screen and the user input device.  For example, the S7 of the Accused Products includes a CPU and GPU, as indicated by Samsung's website.  The processor is a Qualcomm Snapdragon 820 processor, which is operatively coupled to the display screen and the user input device.



*Fig. 21.* Screenshot of Defendants' website touting Accused Products' CPU and GPU, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

97. Accused Products comprise a memory module operatively coupled to the processor module, the memory module comprising executable code for the processor module.  Accused Products include RAM memory modules and flash memory modules and are also compatible with microSD and SIM cards.





*Fig. 22.* Screenshot of Defendants' website touting Accused Products' increased RAM memory modules, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

98. The memory module comprises executable code for the processor module to execute. For example, Accused Products are preloaded with at least the Google Chrome browser application and the Samsung internet browser application. In the below images, both applications can be seen loaded on Accused Products. These applications are located in the memory module of the Accused Products.




*Fig. 23.* Illustrations of the preloaded Google Chrome application (left) and the preloaded Samsung Internet application (right) in the Samsung Galaxy S7.

99. Accused Products receive at least a first and second input from an end user by way of buttons on the home screen and/or a capacitive touchscreen.  Accused Products' touchscreens allow multiple, simultaneous inputs to be entered by a user.

100.      Accused Products open a plurality of applications in response to the plurality of inputs. The plurality of applications comprises at least first, second, and third applications.  Accused Products can open at least a first, second, and third application—in response to the user's inputs.  For example, in the left image below, an Accused Product has opened the Clock application.  In the middle image below, an Accused Product has opened the preloaded Google Chrome browser application.  In the right image below, an Accused Product has opened the Calendar application.

  

*Fig. 24.* Illustrations of the Clock application (left), Google Chrome browser application (middle), and Calendar application (right) displayed in two-dimensional space on a Samsung Galaxy smartphone screen.

101.      Accused Products' applications that are opened are configured to (i) generate an object having application-specific data, (ii) display that object on said display

device, and (iii) allow the user to modify at least a portion of said application-specific data by interacting with the object.

102.    The applications are each configured to generate an object with application-specific data. This "object" is an instance of the application that runs in the memory of Accused Products. Further, Accused Products display the object on its display and allows the user to modify at least a portion of the application-specific data by interacting with the object. The Calendar application, for instance, allows users to interact with application-specific data by clicking on dates and entering appointments. In the image below, the Calendar application displays a different month—compared to the right image of Figure 24 above—after user interaction.



*Fig. 25.* Illustration of the Calendar application displaying a different month (from the right image of Figure 24) after user interaction.

103.    The existence of these objects can be seen in the image below, which shows each instance of the Clock, Google Chrome, and Calendar applications running in the memory of Accused Products.

37



*Fig. 26.* Illustration of a three-dimensional space displaying images of the Clock, Google Chrome, and Calendar applications in a Samsung Galaxy S7.

104.    Accused Products display the timeline associated with the plurality of applications as discussed in the next several paragraphs.

105.    Accused Products generate a plurality of images comprising at least first, second, and third images.  The first image is an image of at least a portion of a first object generated by the first application and having first application-specific data.  For example, in the left illustration of Figure 24 above, an Accused Product generated an image of the Clock application, including its application-specific data.  The second image is an image of at least a portion of a second object generated by the second application and having second application-specific data. For example, in the middle illustration of Figure 24 above, an Accused Product generated an image of the Google Chrome browser application, including its application-specific data like HTML links to other webpages.  Finally, the third image is an image of at least a portion of a third object generated by the third application and having third application-specific data.  In the right illustration of Figure 24 above, an Accused Product generated an image of the Calendar app, including its application-specific data like dates and appointments that the user can modify.

106.	Accused Products display the plurality of images within a three-dimensional space on the display device in an order based on a last time that at least one processor received (i) the first input and a last interaction with the first object, (ii) the second input and a last interaction with a second object, and (iii) a third input and a last interaction with a third object, such that a first one in said order is displayed in a foreground, a second displayed in a background behind at least the first one in the foreground, and a third displayed in a background behind at least the second one.  Figure 26 above is illustrative.

107.	Accused Products further allow users to modify a portion of the first, second, and third application-specific data by receiving a fourth input from at least one input device, with the fourth input interacting with one of the plurality of images corresponding to one of the plurality of applications.  For example, Accused Products can receive an interaction from a user as in the below image (Figure 27), such as by tapping on the Calendar application.

108.	After receiving a user interaction, Accused Products replace the plurality of images within the three-dimensional space (i.e. the stack showing open applications as in Figure 26 above or the left image of Figure 27 below), with one of the first, second, or third object corresponding to one of the plurality of applications within a two-dimensional space in response to the fourth input.  For example, if the user taps the Calendar application, Accused Products will "maximize" and activate the Calendar application in a two-dimensional space, which replaces the three-dimensional space containing the plurality of images.



*Fig. 27.* Illustrations of a three-dimensional space displaying images of three open applications (left) and a two-dimensional space displaying the Calendar application in response to user input (right).

109. Further, Accused Products can receive a fifth input from at least one input device, with the fifth input interacting with one of the first, second, and third objects in the two-dimensional space. For example, as described above, the user can interact with Accused Products' Calendar application, resulting in the Calendar application showing a different month.

110. Accused Products modify one of the first, second, and third application-specific data in response to the fifth input. For example, as described above, upon the user's interaction with the Accused Products' Calendar application, the Calendar application shows a different month.

111. Defendants' infringement of at least Claim 10 of the '654 patent is ongoing.

112. Further, Defendants' infringement as described in Count I above is equally applicable to Defendants' infringement of the '654 patent.

113. Where acts constituting direct infringement of the '654 patent are not performed by Defendants, such acts are performed by Defendants' customers and/or end users, who act at the direction and/or control of Defendants, with Defendants' knowledge. Defendants

took active steps, directly and/or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes claims of '654 patent. Such steps by Defendants include but is not limited to advising and directing customers and/or end users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; and/or distributing instructions that guide end users to use the Accused Products in an infringing manner. Defendants perform these steps, which constitute induced infringement, with knowledge of the patents-in-suit and with the knowledge that the induced acts constitute infringement. Defendants are aware that the normal and customary use of the Accused Products by their customers and/or end users would infringe the patents-in-suit. Defendants' induced infringement is ongoing.

114.    Defendants' acts of infringement have caused damage to SpaceTime3D, and SpaceTime3D is entitled to recover from Defendants the damages it sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

**COUNT III**

**<u>INFRINGEMENT OF U.S. PATENT NO. 9,696,868</u>**

115.    SpaceTime3D repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

116.    Defendants have infringed and continue to infringe the '868 patent directly and/or indirectly (by inducing infringement by others) by, *inter alia*, making, using, selling, importing, and/or offering for sale systems and/or methods that use a two-dimensional space to display and interact with a particular application and a three-dimensional space to visualize, manipulate, navigate, and select between images of open applications, in the manner recited in the claims of the '868 patent.

41

117.    In the alternative to literal infringement, Defendants have infringed and continue to infringe the '868 patent under the doctrine of equivalents.

118.    For example, claim 10 is illustrative of the claims of the '868 patent.  It recites "[a] system for using a two-dimensional (2D) space to selectively interact with at least one of a plurality of applications open on a device and a three-dimensional (3D) space to switch between said plurality of applications, comprising: a display device; at least one input device; at least one processor operatively coupled to said display device and said at least one input device; and a memory device comprising executable code for: receiving a plurality of inputs from a user, said plurality of inputs comprising at least first, second, and third inputs; opening said plurality of applications in response to said plurality of inputs, said plurality of applications comprising at least first, second, and third applications, wherein for each one of said plurality of applications (i) an object is generated having application-specific data, (ii) said object is displayed in said 2D space on said fixed resolution display, and (iii) said user is allowed to modify at least a portion of said application-specific data by interacting with said object; allowing a user to switch between said plurality of application, comprising: generating at least a plurality of images, said plurality of images comprising at least first, second, and third images, wherein said first image is an image of at least a portion of a first object generated by said first application and having first application-specific data, said second image is an image of at least a portion of a second object generated by said second application and having second application-specific data, and said third image is an image of at least a portion of a third object generated by said third application and having third application-specific data; replacing said object corresponding to one of said plurality of applications that is being interacted with by said user in said 2D space with said plurality of images, said plurality of images being displayed in said 3D space and in an order based on a last time that

42

said user one of (i) opened said first application and interacted with said first object; (ii) opened said second application and interacted with said second object, and (iii) opened said third application and interacted with said third object, wherein a first one in said order is displayed a foreground of said 3D space, a second one in said order is displayed in a background of said 3D space behind at least said first one in said order, and a third one in said order is displayed in said background of said 3D space behind at least said second one in said order; allowing said user to move said plurality of images, wherein (i) movement of one of said plurality of images results in movement of all of said plurality of images, and (ii) continued movement in one direction of one of said plurality of images results in a perception to said user that said one of said plurality of images is moved off of said fixed resolution display; and allowing said user to delete at least one of said plurality of images from said 3D space, wherein deletion of said second one in said order results in said third one in said order being moved to a location in said 3D space where said second one in said order was located prior to said deletion; and allowing said user to interact with one of said first, second, and third applications, comprising: receiving a selection from said user of one of said plurality of images corresponding to one of said plurality of applications; replacing said plurality of images within said 3D space with one of said first, second, and third objects corresponding to said one of said plurality of applications within said 2D space in response to said selection; receiving at least one interaction by said user with said one of said first, second, and third objects within said 2D space; and modifying said one or said first, second, and third application-specific data in response to said at least one interaction."

43

119. Defendants' Accused Products, including but not limited to the Samsung Galaxy S7 ("S7"), practice every element of these claims.[6]

120. Accused Products provide a system for using a two-dimensional space to selectively interact with at least one of a plurality of applications open on a computing device and a three-dimensional space to switch between the plurality of applications, as described below.

121. Accused Products comprise a display screen, as seen in the image below.



*Fig. 28.* Illustration of Accused Products' display screen, available at https://www.samsung.com/global/galaxy/galaxy-s7/design/.

122. Accused Products comprise at least one input device. Accused Products' touchscreen allows multiple, simultaneous inputs to be entered by a user. Accused Products also include context-sensitive "soft" buttons, such as a back button and a "Recents" button, the latter of which pulls up a user's open applications and windows.

123. Accused Products comprise a processor module operatively coupled to the display screen and the user input device. For example, the S7 of Accused Products includes a CPU and GPU, as indicated by Samsung's website. The processor is a Qualcomm Snapdragon 820 processor, which is operatively coupled to the display screen and the user input device.

---

[6] This description of infringement is illustrative and not intended to be an exhaustive or limiting explanation of every manner in which Defendants' products infringe.



*Fig. 29.* Screenshot of Defendants' website touting Accused Products' CPU and GPU, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

124.    Accused Products comprise a memory module operatively coupled to the processor module, the memory module comprising executable code for the processor module. Accused Products include RAM memory modules and flash memory modules and are also compatible with microSD and SIM cards.



*Fig. 30.* Screenshot of Defendants' website touting Accused Products' increased RAM memory modules, available at https://www.samsung.com/global/galaxy/galaxy-s7/hardware/.

125.    The memory module comprises executable code for the processor module to execute.  For example, Accused Products are preloaded with at least the Google Chrome browser application and the Samsung internet browser application.  In the below images, both applications can be seen loaded on Accused Products.  These applications are located in the memory module of the Accused Products.

 

*Fig. 31.* Illustrations of the preloaded Google Chrome application (left) and the preloaded Samsung Internet application (right) in the Samsung Galaxy S7.

126.    Accused Products receive a plurality of inputs from a user—comprising at least first, second, and third inputs—through buttons on the home screen and/or a capacitive touchscreen.  Accused Products' touchscreen allows multiple, simultaneous inputs to be entered by a user.  Accused Products also includes context-sensitive "soft buttons," such as a back button and a "Recents" button.  The latter pulls up a user's open applications and windows.

127.    Accused Products can open at least a first, second, and third application— in response to the user's inputs.  For example, in the left image below, an Accused Product has opened the Clock application.  In the middle image below, an Accused Product has opened the

preloaded Google Chrome browser application.  In the right image below, an Accused Product has

opened the Calendar application.

  

*Fig. 32.* Illustrations of the Clock application (left), Google Chrome browser application (middle), and Calendar application (right) displayed in two-dimensional space on a Samsung Galaxy smartphone screen.

128.    The applications are each configured to generate an object with application-specific data.  This "object" is an instance of the application that runs in the memory of Accused Products.  Further, Accused Products display the object on its display and allows the user to modify at least a portion of the application-specific data by interacting with the object.  The Calendar application, for instance, allows users to interact with application-specific data by clicking on dates and entering appointments.  In the image below, the Calendar applications displays a different month—compared to the right image of Figure 32 above—after user interaction.



*Fig. 33.* Illustration of the Calendar application displaying a different month (from the right image of Figure 32) after user interaction.

129.    The existence of these objects can be seen in the image below, which shows each instance of the Clock, Calendar, and Google Chrome browser applications running in the memory of Accused Products.



*Fig. 34.* Illustration of a three-dimensional space displaying images of the Clock, Google Chrome browser, and Calendar applications in a Samsung Galaxy S7.

48

130. Accused Products display on its screen information on the plurality of applications.

131. Accused Products generate a plurality of images comprising at least first, second, and third images. The first image is an image of at least a portion of a first object generated by the first application and having first application-specific data. For example, in the left illustration of Figure 32 above, an Accused Product generated an image of the Clock application, including its application-specific data. The second image is an image of at least a portion of a second object generated by the second application and having second application-specific data. For example, in the middle illustration of Figure 32 above, an Accused Product generated an image of the Google Chrome browser application, including its application-specific data like HTML links to other webpages. Finally, the third image is an image of at least a portion of a third object generated by the third application and having third application-specific data. In the right illustration of Figure 32 above, an Accused Product generated an image of the Calendar app, including its application-specific data like dates and appointments that the user can modify.

132. Accused Products display the plurality of images within a three-dimensional space on the display device, with the first application displayed in a foreground, a second displayed in a background behind at least the first one in the foreground, and a third displayed in a background behind at least the second one. Figure 34 above is illustrative.

133. Accused Products further allow users to modify a portion of the first, second, and third application-specific data by receiving a first interaction from the user with one of the plurality of images corresponding to one of the plurality of applications. For example, Accused Products can receive an interaction from a user as in the below image, such as by tapping on the Calendar application.

134.     After receiving a user interaction, Accused Products replace the plurality of images within the three-dimensional space (i.e. the stack showing open applications as in Figure 34 above or the left illustration of Figure 35 below), with one of the first, second, or third objects corresponding to one of the plurality of applications within a two-dimensional space.  For example, if the user taps the Calendar application, Accused Products will "maximize" and activate the Calendar application in a two-dimensional space, which replaces the three-dimensional space with the plurality of images.



*Fig. 35.* Illustrations of a three-dimensional space displaying images of three open applications (left) and a two-dimensional space displaying the Calendar application in response to user input (right).

135.     Accused Products allow the user to move the plurality of images.  For example, in the left illustration of Figure 36 below, when a user moves the Clock application image downward, the subsequent images will follow, and if the Clock application image is continuously moved downward, it will disappear off the display.



*Fig. 36.* Illustration of a user continuously moving downward the Clock application image (left) until that image disappears off the display and the Google Chrome browser application image is moved to the space where the Calendar application image was previously located while the Calendar application image is moved to the space where the Clock application image was previously located (right).

136.    Accused Products allow the user to delete at least one of the plurality of images from the three-dimensional immersive space.  Deletion of the second image results in the third image being moved to the space where the second image was previously located prior to its deletion.  For example, in the right illustration of Figure 36 above, if a user continuously moves downward the Clock application image, that image will be deleted from the plurality of images and the order of each remaining image will shift, i.e. with the Google Chrome browser application image moved to where the Calendar application image was previously located and the Calendar application image moved to where the Clock application image was previously located.

137.    Defendants' infringement of at least Claim 10 of the '868 patent is ongoing.

138.    Further, Defendants' infringement as described in Count I above is equally applicable to Defendants' infringement of the '868 patent.

51

139.     Where acts constituting direct infringement of the '868 patent are not performed by Defendants, such acts are performed by Defendants' customers and/or end users, who act at the direction and/or control of Defendants, with Defendants' knowledge.  Defendants took active steps, directly and/or through contractual relationships with others, with the specific intent to cause them to use the Accused Products in a manner that infringes claims of '868 patent. Such steps by Defendants include but are not limited to advising and directing customers and/or end users to use the Accused Products in an infringing manner; advertising and promoting the use of the Accused Products in an infringing manner; and/or distributing instructions that guide end users to use the Accused Products in an infringing manner.  Defendants perform these steps, which constitute induced infringement, with knowledge of the patents-in-suit and with the knowledge that the induced acts constitute infringement.  Defendants are aware that the normal and customary use of the Accused Products by their customers and/or end users would infringe the patents-in-suit.  Defendants' induced infringement is ongoing.

140.     Defendants' acts of infringement have caused damage to SpaceTime3D, and SpaceTime3D is entitled to recover from Defendants the damages it sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial.

## WILLFUL INFRINGEMENT

141.     SpaceTime3D repeats and incorporates by reference each preceding paragraph as if fully set forth herein and further states:

142.     Defendants' infringement of the patents-in-suit was and continues to be willful, intentional, deliberate, and/or in conscious disregard of SpaceTime3D's rights under the patents-in-suit.

143.     For one non-exhaustive example, Defendants received actual notice and/or had actual knowledge of the published '018 patent application no later than May 2008. SpaceTime3D explicitly referenced its patent-pending technology in at least four separate communications to Samsung dated March 11, 2008; May 15, 2008; May 26, 2010; and June 3, 2010.

144.     As yet another example, Defendants received actual notice and/or had actual knowledge of the '018 patent, the parent patent to the patents-in-suit, at least in June 2012 when a patent examiner issued a non-final rejection of a Samsung patent application on the ground that its claims would have been obvious to one of an ordinary skill in the art, in view of the '018 patent.

145.     Likewise, Defendants received actual notice and/or had actual knowledge of the '048 patent, when a patent examiner cited to SpaceTime3D's Patent Application 12/751,879, now the '048 patent, during the prosecution of Samsung's Patent Application 13/049,262.

146.     In addition, the filing of this lawsuit provides Defendants with further notice of each of the Asserted Patents such that any continued infringement by Defendants after the filing date of this lawsuit constitutes willful infringement.

147.     Defendants willfully infringed and continue to infringe the patents-in-suit having actual knowledge of the patents.

## DEMAND FOR JURY TRIAL

148.     Plaintiff demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff SpaceTime3D requests entry of judgment in its favor and against Defendants Samsung Electronics Co., Ltd., and Samsung Electronics America, Inc., as follows:

53

Case 2:19-cv-00372-JRG    Document 1    Filed 11/14/19    Page 54 of 55 PageID #:  54

a)      Declaration that Defendants have infringed and continue to infringe United States Patent Nos. 8,881,048; 9,304,654; and 9,696,868;

b)      Awarding damages, in an amount no less than a reasonable royalty, arising out of Defendants' infringement of United States Patent Nos. 8,881,048; 9,304,654; and 9,696,868 to SpaceTime3D, together with pre-judgment and post-judgment interest, in an amount according to proof;

c)      Awarding pre-issuance damages pursuant to 35 U.S.C. § 154(d);

d)      Awarding the trebling of any and all damages awarded to SpaceTime3D by reason of Defendants' willful infringement of United States Patent Nos. 8,881,048; 9,304,654; and 9,696,868, pursuant to 35 U.S.C. § 284;

e)      Awarding attorney's fees pursuant to 35 U.S.C. § 285 or as otherwise permitted by law; and

f)      Awarding such other costs and further relief as the Court may deem just and proper.


DATED: November 14, 2019

Respectfully submitted,

*/s/ Max L. Tribble, Jr.*_____
Max L. Tribble, Jr. – Lead Counsel
Texas State Bar No. 20213950
**SUSMAN GODFREY, L.L.P.**
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
mtribble@susmangodfrey.com

Matthew R. Berry
Washington State Bar No. 37364
**SUSMAN GODFREY, L.L.P.**
1201 Third Ave., Suite 3800

54

Seattle, Washington 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
mberry@susmangodfrey.com

Y. Gloria Park
New York Bar No. 5477047
**SUSMAN GODFREY, L.L.P.**
1301 Ave. of the Americas, 32nd Fl.
New York, New York 10019-6023
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
gpark@susmangodfrey.com

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
Capshaw DeRieux, LLP
114 E. Commerce Ave.
Gladewater, TX 75647
Telephone: 903-845-5770
ccapshaw@capshawlaw.com
ederieux@capshawlaw.com

55